JODI LINKER
Federal Public Defender
Northern District of California
VARELL L. FULLER
Assistant Federal Public Defender
8th Floor - Suite 820
55 South Market Street
San Jose, CA 95113
Telephone: (408) 291-7753
Facsimile: (408) 291-7399
Email: Varell_Fuller@fd.org

Counsel for Defendant Naziry

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

OMAR NAZIRY,

Defendant.

**Case No.:** CR 24–418 PCP; CR 24-419 PCP

**DEFENDANT'S MOTION FOR REVOCATION OF MAGISTRATE'S DETENTION ORDER UNDER 18 U.S.C. § 3145 AND REQUEST FOR RELEASE ON CONDITIONS**

**Court:** Courtroom 8, 4th Floor
**Hearing Date:** October 23, 2024
**Hearing Time:** 10:00 a.m.

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Mr. Naziry's Personal Background ........ 2

II. Mr. Naziry's Arrest and Detention on the Instant Case ........ 3

ARGUMENT ........ 5

I. This Court Reviews the Detention Order *De Novo* ........ 5

II. Under Both the Due Process Clause and the Bail Reform Act, Pretrial Release is Required in all but the Rarest of Circumstances ........ 6

III. The Government Has Not Met Its Burden of Proving That Mr. Naziry Poses a "Serious" Risk of Flight or Nonappearance, and the Factors in § 3142(g) Support Release ........ 8

A. Under § 3142(g)(1), the Nature and Circumstances of the Offense Support Release ........ 9

B. The Weight of the Evidence, Under § 3142(g)(2), Is the Least Important Factor ........ 10

C. Mr. Naziry's History and Characteristics Under § 3142(g)(3) Support Release ........ 10

D. Under § 3142(g)(4), Mr. Naziry Does Not Pose a Danger or Risk of Non-Appearance that Cannot be Mitigated by Conditions of Release ........ 12

IV. Defendants on Pretrial Release Have a High Degree of Success, While Pretrial Detention May Have Severe and Unintended Adverse Impacts ........ 13

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Corley v. United States*,
556 U.S. 303 (2009) .......... 8

*United States v. Chen*,
820 F. Supp. 1205 (N.D. Cal. 1992) .......... 6

*United States v. Figueroa-Alvarez*,
681 F.Supp.3d 1131 (D. Idaho 2023) .......... 6, 7, 8

*United States v. Koenig*,
912 F.2d 1190 (9th Cir. 1990) .......... 5

*United States v. Madoff*,
586 F. Supp. 2d 240 (S.D.N.Y. 2009) .......... 12, 13

*United States v. Motamedi*,
767 F.2d 1403 (9th Cir. 1985) .......... 6,10

*United States v. Orta*,
760 F.2d 887, 891 92 (8th Cir. 1985) (en banc) .......... 7

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 5

*United States v. Santos-Flores*,
794 F.3d 1088 (9th Cir. 2015) .......... 6, 8, 12-13

### STATUTES

18 U.S.C. § 641 .......... 1

18 U.S.C. § 1341 .......... 1, 3

18 U.S.C. § 3142 .......... *passim*

18 U.S.C. § 3145 .......... 1, 5

### OTHER

U.S.S.G. § 2B1.1 .......... 9

U.S.S.G. § 5C1.1 .......... 9

Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis*,
(2002) .......... 14

Jaden M. Lessnick, Comment, *Pretrial Detention by a Preponderance: The Constitutional and Interpretive Shortcomings of the Flight-Risk Standard*,
89 U. CHI. L. REV. 1245 (2022) .......... 7

Marty Berger, Note, *The Constitutional Case for Clear and Convincing Evidence in Bail Hearings*,
75 STAN. L. REV. 469 (2023) .......... 7

United States Courts, *Pretrial Release and Detention in the Federal Facility* .......... 13-14

## INTRODUCTION

Defendant Omar Naziry respectfully moves the Court to revoke Magistrate Judge van Keulen's order of detention pursuant to 18 U.S.C. § 3145(b) and order his release on conditions pursuant to the Bail Reform Act, 18 U.S.C. § 3142 et seq., and the Fifth Amendment's Due Process Clause. In the alternative, the Court should vacate the magistrate's order and remand to the magistrate with instructions to order Mr. Naziry's release pursuant to conditions to be set by the Court.

Mr. Naziry is charged in two separate indictments with violating 18 U.S.C. § 641 (Theft of Government Property) and 18 U.S.C. § 1341 (Mail Fraud). The alleged offenses are non-violent white-collar offenses. The magistrate here ordered detention on the grounds that Mr. Naziry posed a serious risk of flight that could not be mitigated by any conditions of release because he hid from law enforcement on the morning of his arrest. Dkt. 12 (9/30/24 Minute Order).[1] On the contrary, as outlined herein, any flight risk may be mitigated by appropriate conditions, and Mr. Naziry is not a danger to the community. Accordingly, the defense respectfully requests that this Court follow the recommendation of United States Pretrial Services and set release conditions. Dkt. 18 (United States Pretrial Services Report, Northern District of California).

To justify detention on the grounds that the defendant poses a risk of non-appearance, the government must establish a serious risk of non-appearance that conditions cannot mitigate. The record does not support this conclusion, and Mr. Naziry should be released in accordance with the requirements of the Bail Reform Act, given the availability of a secured or unsecured bond with financial and legal consequences as well as electronic monitoring, none of which was in place when Mr. Naziry hid from law enforcement.

Mr. Naziry requests the Court follow Pretrial Services' recommendation and permit Mr. Naziry to be released to the San Francisco halfway house on a $25,000 unsecured bond, then return to his parents' home in Orlando, Florida, once their home is determined by Pretrial Services to be a suitable release location. Defense counsel has confirmed that Mr. Naziry's parents would permit their son to return to their home. Mr. Naziry's parents are also prepared to post up to $5,000 on a secured bond.

---

[1] All references to docket numbers refer to the items' location on the docket in No. 24-cr-418 PCP.

Mr. Naziry is also prepared to submit to electronic monitoring as a condition of his release.

## BACKGROUND[2]

### I. Mr. Naziry's Personal Background

Mr. Omar Naziry was born in Kabul, Afghanistan. He is 40 years old. He is a naturalized United States Citizen. He has no criminal history. He is single, has no children, and has no significant other. In 2000, when Mr. Naziry was approximately sixteen years old, he immigrated with his parents to the United States as a political refugee from the Taliban, which ruled the country when they fled. In Afghanistan, Mr. Naziry and his family were traumatized by the brutality of the Taliban they witnessed and experienced. Mr. Naziry's parents, Abdulla Naziry and Shirin Naziry, were liberals; they are Sunni and consume alcohol. His parents now live in Orlando, Florida. They are retired, in their seventies, and live on Social Security income. They own their home.

Their primary language is Farsi, but they speak and understand some English. They can also read and write some English. Mr. Naziry's mother has health issues. In Afghanistan, his mother was a feminist and a member of the communist party, and his father was in the military. The family feared for their lives and believed the Taliban would have killed them if they had learned of his mother's prior political party membership. Many of their family friends were killed by the Taliban. When he was approximately eleven or twelve, Mr. Naziry recalls an incident when the Taliban rounded up three friends, took them to the back of the apartment complex, and executed them.

Mr. Naziry has a degree in Management Information Systems from the University of Central Florida and a Masters Degree from Carnegie Mellon University for postgraduate coursework he completed while employed in the Bay Area. He has also obtained professional certifications from Drexel University. In 2000, Mr. Naziry moved to the Bay Area, where he worked for Lockheed Martin as a Business Systems Analyst in Sunnyvale, California. He has a history of mental health issues. He reports having ADHD and being prescribed Adderall approximately fifteen years ago. He reports a 2016 mental health crisis due to a failed business venture and engagement. He reports this

---

[2] Defense counsel proffers certain facts set forth herein based on information and belief. Some of these facts are set forth in the Pretrial Services Report, and are pending verification by Pretrial. Additionally, some of the events on the morning of Mr. Naziry's arrest may be depicted on recently-provided body-worn camera footage, which the defense has not yet fully reviewed.

resulted in his hospitalization. He has no substance abuse history and no history of gang membership or affiliation. Mr. Naziry is indigent, and his most significant reported asset is a 2009 Mitsubishi Lancer valued at approximately $9,000.

Defense counsel has Mr. Naziry's United States Passport that he is prepared to surrender to Pretrial Services as a release condition. He has not left the United States since arriving, except for a cruise to the Bahamas in approximately 2000.

**II. Mr. Naziry's Arrest and Detention on the Instant Case**

In the first of two separately charged indictments in this case, Mr. Naziry is alleged to have committed theft of government property in relation to housing benefits he allegedly received in Santa Clara County. No. 24-cr-0418 PCP. In the second indictment, he is alleged to have committed mail fraud in relation to communications he allegedly sent to his former employer, Lockheed Martin, regarding employment benefits related to claimed military service. No. 24-cr-0419 PCP.

Mr. Naziry allegedly committed the mail fraud offense in the Northern District of California between 2016 and 2021. At that time, he had lived in the Bay Area for a number of years. In March 2022, he received a letter from Lockheed Martin informing him that Lockheed had determined that he had submitted fraudulent military orders. Exh. C (Lockheed Letter). In April 2022, he was contacted by law enforcement about this alleged offense. The encounter was captured on an officer's body-worn camera. Based on the defense's initial review of the footage, the defense proffers as follows: During the interview, Mr. Naziry was cooperative. He advised the officers that he was no longer employed at Lockheed and was unemployed. He questioned the basis for the charges, stated at several points that he would like to speak to an attorney, and asked about potential punishments if a person were convicted of the alleged charges. He provided officers with his phone number and stated that his parents lived in Orlando, Florida. After the interview, officers stated that the case would be referred to the district attorney's office, and they would be seeking an arrest warrant for him.

In June 2022, still unemployed, Mr. Naziry moved back to Orlando, Florida, to live with his parents and forwarded his mail to their address. More than two years later, a large team of armed tactical officers arrested him on the instant charges on August 22, 2024, at his family's home in Orlando, Florida.

That same day, a magistrate in the Middle District of Florida held a detention hearing at which one of the arresting officers testified, and he was ordered detained as a risk of flight because he had hid in a small closet when the officers arrived, unannounced, to arrest him. *See* Exh. A (8/22/24 Transcript of Bail Proceedings). The officer further testified regarding interviews they conducted with Mr. Naziry's parents that morning. His mother was questioned in a different area of the house and stated that he had left days earlier. His father was located at a local gym, and also stated that Mr. Naziry had left. *Id*. Following a search of the house, Mr. Naziry was found in a closet below a furnace and was arrested without incident. *Id*.

The defense proffers the following regarding the circumstances of Mr. Naziry's arrest: On August 22, 2024, a tactical SWAT team hit Mr. Naziry's house in Orlando, Florida, unannounced, to arrest him on the instant charges. Officers detained and questioned his elderly mother. She was afraid and feared for her son's life. The government contends Mr. Naziry's mother helped to hide him in the home. Mr. Naziry denies that allegation. The defense proffers that Mr. Naziry's parents' home is a two-story residence. Mr. Naziry's parents live on the first floor. Mr. Naziry lives in the basement near the garage and has a separate entrance. The defense further proffers that Mr. Naziry's mother was asleep on the first level when officers arrived and went to open the door. Mr. Naziry's father was at the gym when officers went to the residence. Mr. Naziry's parents also deny the government's suggested narrative that their son was eating breakfast before officers knocked on the door, or that his mother then assisted him to hide[3]. The defense proffers that Mr. Naziry heard the commotion, became afraid for his personal safety, and hid. He sincerely feared he would be physically harmed. He was not trying to flee. Instead, he was simply afraid of the officers. The defense further proffers that Mr. Naziry's mental health issues were a factor in his poor decision to hide. He has a history of ADHD and had previously experienced a mental health crisis.

After out-of-district transfer proceedings pursuant to Fed. R. Crim. P. 5, Mr. Naziry was transported to this district in custody for his initial appearance on September 25, 2024. Dkt. 8 (Minute Order – Initial Appearance). At that time, Magistrate Judge van Keulen ordered a complete

---

[3] The defense's understanding is corroborated by recently produced body worn camera footage reflecting that Mr. Naziry's mother opened the door two and half minutes after officer first knocked.

bail study at the defense's request. *Id*.

On September 30, 2024, Magistrate Judge van Keulen held a detention hearing. *See* Notice of Manual Filing, Exh. B (9/30/24 Audio of Detention Hearing). Supervisory Pretrial Services Officer Anthony Granados recommended that Mr. Naziry be released on a $25,000 unsecured bond. (Pretrial Services has since submitted its bail study containing the same recommendation. Dkt. 18.) At the hearing, the government argued in part that Magistrate Judge Irick's detention order issued in the Middle District of Florida should be upheld.[4] The defense proffered several changed circumstances, including the fact that the detention order in Florida was set in a Rule 5 removal proceeding. In contrast, Magistrate Judge van Kuelen was not considering detention or release as in a Rule 5 context. Additionally, the defense proffered Mr. Naziry's parents as potential sureties. Following the parties' presentations, Judge van Keulen ordered Mr. Naziry to be detained.

However, the magistrate's analysis was incomplete. As outlined herein, the court only considered the availability of the potential sureties, found they were unsuitable, and failed to consider whether any release conditions, such as electronic monitoring, a secured bond, or placement at the halfway house, would mitigate the risk of flight. Exh. B (Audio Recording); Dkt. 12 (Minute Order – Detention Hearing). The magistrate also erred by giving excessive weight to the fact that Mr. Naziry had hid at the time of the tactical operation, given all the circumstances set forth herein.

Mr. Naziry has now been in custody for approximately two months. For the reasons outlined, the Court should order his release on conditions.

## ARGUMENT

### I. This Court Reviews the Detention Order *De Novo*

This motion arises under 18 U.S.C. § 3145(b), which provides for *de novo* review of a magistrate judge's detention order. *See, e.g., United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). A motion for revocation or amendment "shall be determined promptly," reflecting the serious nature of detaining any defendant unnecessarily. § 3145(b). This Court "review[s] the evidence before the magistrate and make[s] its own independent determination of whether the magistrate's

[4] The government alternatively argued that Mr. Naziry must either appeal to the district court or return to the Middle District of Florida to demonstrate changed circumstances to reconsider Magistrate Judge Irick's detention order, but the magistrate rejected those arguments.

findings are correct, with no deference," and may hold additional evidentiary hearings if it deems them necessary or desirable. *Koenig*, 912 F.2d at 1193.

**II. Under Both the Due Process Clause and the Bail Reform Act, Pretrial Release is Required in all but the Rarest of Circumstances**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). A pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the Due Process Clause; any governmental infringement on this right must be narrowly tailored to achieve a compelling government interest. *Id*.

Pursuant to 18 U.S.C. § 3142(b), the court "shall order the pretrial release of the [defendant] on personal recognizance . . . unless" there are no conditions of release that would reasonably assure (1) that the defendant will return to court and (2) that he will not pose a danger to the community. The Ninth Circuit has made clear that "[o]nly in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Thus, criminal defendants are ordinarily entitled to pretrial release under the Bail Reform Act. *See United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (Kennedy, J.) (noting that "federal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail" and "[o]nly in rare circumstances should release be denied"); *see also United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) (only a "reasonable assurance" is required; there is no requirement that the conditions of release provide an "ironclad guarantee").

The government must establish that the case falls within one of the enumerated categories under § 3142(f) to trigger a detention hearing. "In shorthand form, detention hearings are authorized only if the defendant (i) is charged with one of five categories of serious crimes – crimes that, if the defendant were to recidivate while on pretrial release, pose the greatest risk to community safety, or (ii) presents a serious risk of flight, or a serious risk of obstruction or intimidation – acts that present the greatest risk to the integrity of the judicial process." *United States v. Figueroa-Alvarez*, 681 F.Supp.3d 1131, 1135 (D. Idaho 2023) (discussing grounds on which government may seek detention

under § 3142(f)). "Absent one of these serious circumstances that would automatically trigger a detention hearing, a defendant must be released on personal recognizance, unsecured appearance bond, or conditions." *Id*. at 1135-36 (describing the court's initial inquiry into whether a detention hearing is warranted as a "gate-keeping" function, and citing 18 U.S.C. § 3142(a)).

Once the government establishes that the case falls within one of the narrow grounds in which a detention hearing may be held, the government bears the burden of establishing that the defendant should be detained and must either prove by clear and convincing evidence that the defendant is a danger to the community, or must prove by a preponderance of the evidence that a defendant poses a flight risk.[5] 18 U.S.C. § 3142(f); *see Figueroa-Alvarez*, 681 F.Supp.3d at 1139 n.5 ("a defendant determined to be a serious risk of flight at the gatekeeping stage may nonetheless argue at the subsequent detention hearing that he or she should be released on conditions").

The Bail Reform Act also specifies the factors that the court "shall . . . take into account" when deciding whether to set conditions: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person, including the person's character and condition, family, community, and employment ties, financial resources, past conduct, drug and alcohol history, criminal history, prior record of nonappearance, and whether the person was on probation or parole at the time of the offense; and (4) the nature and seriousness of the danger that the person would pose to any person or the community if released. 18 U.S.C. § 3142(g)(1)-(4). In conducting this analysis, the court must make an individualized determination. *See Santos-Flores*, 794 F. 3d at 1092 ("The court may not [ ] substitute a categorical denial of bail for the individualized evaluation required by the Bail Reform Act"). Regarding danger, the conditions imposed must be sufficient to "reasonably assure" the safety of the community, but safety need not be absolutely guaranteed. *See United States v. Orta*, 760 F.2d 887, 889-90, 891 92 (8th Cir. 1985) (en banc) (noting

---

[5] Notably, recent scholarship has suggested that—for both constitutional and statutory reasons—the government should be required to prove by clear and convincing evidence that no conditions of release will reasonably assure a person's appearance. *See generally, e.g.*, Jaden M. Lessnick, Comment, *Pretrial Detention by a Preponderance: The Constitutional and Interpretive Shortcomings of the Flight-Risk Standard*, 89 U. CHI. L. REV. 1245 (2022); Marty Berger, Note, *The Constitutional Case for Clear and Convincing Evidence in Bail Hearings*, 75 STAN. L. REV. 469 (2023).

that the Bail Reform Act does not require the magistrate judge to find that conditions of release will "guarantee" the defendant's appearance or the safety of the community).

The Bail Reform Act provides four options for a court considering the pretrial release of a defendant: (1) release on personal recognizance or upon execution of an unsecured appearance bond pursuant to 18 U.S.C. § 3142(b); (2) release on one or more conditions specified in § 3142(c); (3) temporary detention to permit revocation of conditional release, deportation, or exclusion, under § 3142(d); or (4) pretrial detention under § 3142(e).

In cases where the court imposes a financial condition, the Bail Reform Act "prohibits pretrial detention on the sole basis of an inability to satisfy a financial condition of release." *Orta*, 760 F.2d at 892 n.22; 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

## III. The Government Has Not Met Its Burden of Proving That Mr. Naziry Poses a "Serious" Risk of Flight or Nonappearance, and the Factors in § 3142(g) Support Release

Ordinary "risk of flight" is not a factor in § 3142(f). Instead, § 3142(f) authorizes detention only "in a case that involves" a "serious risk" that the person will flee. § 3142(f)(2)(A). "More finely put, this means that the Government must demonstrate that it is more likely than not that there is a serious risk that the defendant will flee, not that it is more likely than not that the defendant will flee." *Figueroa-Alvarez*, 681 F.Supp.3d at 1138. Given the BRA's presumption in favor of release, a defendant should never be detained as a "serious risk" of flight when the risk of flight or nonappearance can be mitigated by conditions of release such as electronic monitoring, GPS monitoring, a secured bond, and support from pretrial services. There is some risk of nonappearance, and potentially some risk of flight, in every criminal case; "serious risk" of flight means something more. *Compare, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretative canons [is] that a statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)).

Thus, the government must demonstrate that the risk of flight in a particular case rises to the level of extreme or unusual. Courts have articulated the elements of this extreme or unusual standard in different ways, but the upshot remains the same—defendants are "serious" flight risks in only rare

cases. *See United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) ("Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant."); *Figueroa-Alvarez*, 681 F.Supp.3d at 1138 (" a 'serious risk of flight' under § 3142(f)(2)(A) is a great risk – beyond average – that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision").

Here, Mr. Naziry must be released on conditions because the government has failed to meet its burden to demonstrate by a preponderance of the evidence that Mr. Naziry is a flight risk; conditions may mitigate any risk of flight; and the factors in § 3142(g) support release.

**A. Under § 3142(g)(1), the Nature and Circumstances of the Offense Support Release**

With respect to the nature and circumstances of the offense, defense counsel has conducted a preliminary review of recently provided discovery, including investigative documents prepared by the alleged victim company in the mail fraud count, Lockheed Martin, which indicates a $456,349.81 total loss amount for the alleged fraud offense over five years. Assuming this loss amount is correct, if Mr. Naziry is convicted following a guilty plea, his guideline calculation under the U.S. Sentencing Guidelines would likely be as follows: Offense Level 18, minus 3 levels for acceptance of responsibility, and minus 2 levels because Mr. Naziry is a first offender, which results in an Adjusted Offense Level of 13. In Criminal History Category I, with no criminal history points, Mr. Naziry would fall in Zone C, with an advisory guideline range of 12 to 18 months. A sentence within Zone C would permit a "split" sentence that includes home confinement. *See* U.S.S.G. § 2B1.1, § 5C1.1. Thus, Mr. Naziry has already served nearly two months in custody on a case that could potentially involve a sentence of home confinement or even probation, given the relatively low sentencing guideline range and Mr. Naziry's status as a non-violent first offender. While the magistrate did not consider this factor, Mr. Nazriy has little incentive to flee a potentially non-custodial sentence.

Additionally, Mr. Naziry is not charged with an offense that triggers a "presumption" in favor of detention, nor an offense that necessarily triggers a detention hearing. The instant offense is a non-violent white-collar offense involving less than $500,000. The government argues that Mr. Naziry is a flight risk in part because of the alleged offense conduct. The Court should reject this argument

outright because it is not credible. The government waited two years to indict Mr. Naziry, permitting him to remain in the community during that time. Finally, defense counsel could not identify any evidence that Mr. Naziry continued to engage in the alleged offense after being interviewed by law enforcement or that he committed any other offenses in the intervening two years.

**B. The Weight of the Evidence, Under § 3142(g)(2), Is the Least Important Factor**

The weight of the evidence under § 3142(g)(2) is the least important factor in the analysis. *See Motamedi*, 767 F.2d at 1408 (explaining that in light of the presumption of innocence, the weight of the evidence is the least important factor in the bail analysis and concluding that the government failed to establish that the defendant should be detained). In this case, the government has recently produced approximately 1,800 pages of discovery, as well as audio and/or video recordings. As noted in the previous section, the defense has conducted a preliminary review to calculate Mr. Naziry's potential sentencing exposure, and further defense review is ongoing.

**C. Mr. Naziry's History and Characteristics Under § 3142(g)(3) Support Release**

Mr. Naziry's history and characteristics strongly support release. Mr. Naziry is a U.S. citizen who has resided in the U.S. for over twenty years. He is a college graduate with no criminal history and no history of ever failing to appear, and he has otherwise lived a law-abiding life—not even a conviction for a vehicle code violation. He has strong community ties to both the Bay Area and Orlando, Florida. *Compare Motamedi*, 767 F.2d at 1407-08 (citing "many factors" in § 3142(g) that supported release on conditions, including that defendant was an Iranian citizen who was a permanent resident of the U.S, had lived in the U.S. for nearly ten years and had applied for citizenship, had numerous relatives in the area, had no prior criminal record, had no history of alcohol or drug abuse, and parents had posted security on bond).

At the time of his arrest, Mr. Naziry had been aware of this investigation, and the potential criminal prosecution, for over two years. As previously discussed, he had received a letter in March, 2022, regarding Lockheed's investigation, and he was interviewed by law enforcement shortly thereafter. Mr. Naziry was cooperative when interviewed. He invited the officers into his apartment, was cordial, provided his driver's license, and told officers that he had quit his job at Lockheed

Martin and was unemployed. He also provided law enforcement with his phone number, and told officers that his parents lived in Orlando, Florida. After the interview, officers informed him that they would be seeking a warrant for his arrest. Mr. Naziry did not flee, despite this advisement.

In June 2022, then unemployed, Mr. Naziry moved back to Orlando, Florida, to live with his parents and forwarded his mail to their address. If Mr. Naziry was attempting to flee or hide from the authorities in relation to this offense, he certainly would not have forwarded his mail to his parent's address after he was questioned by law enforcement. The defense proffers that although he had moved, Mr. Naziry fully expected to be contacted again about the offense, he was fully prepared to return to California voluntarily, and he would have done so if summoned. However, he never imagined a tactical SWAT team with a dozen or more officers would raid his parent's home to arrest him, given the alleged non-violent offense.

Mr. Naziry's conduct on the morning of his arrest must also be viewed in the context of the trauma he and his family endured under the Taliban in Afghanistan. As discussed, on August 22, 2024, a tactical team arrived unannounced at the home of Mr. Naziry's parents in Florida. Numerous armed officers in tactical gear knocked loudly on the door and announced their presence. In the moment when law enforcement arrived at his home, and he heard repeated loud knocking on his door, he hid because he was confused, afraid, and genuinely fearful for his safety. It is reasonable to assume that he was acting in part out of fear arising from his years living under Taliban rule as a child. The defense proffers that Mr. Naziry, when arrested, expressed to officers his fears of physical harm. After he was located, he was arrested without incident.

Additionally, Mr. Naziry has a history of mental health issues, which may have been a factor in why he hid from law enforcement, but his mental health issues may easily be addressed by including mental health counseling and treatment as a release condition. Moreover, he is indigent and does not have the financial resources to flee.

On this record, it was error to find that no release conditions could be fashioned to mitigate flight risk.

**D. Under § 3142(g)(4), Mr. Naziry Does Not Pose a Danger or Risk of Non-Appearance that Cannot be Mitigated by Conditions of Release**

Finally, Mr. Naziry does not pose a danger to any person in the community, he has no criminal history, and he has no history of failures to appear. The Bail Reform Act, as discussed, sets a presumption in favor of release, and it is the rare case in which a person should be held without bail. The government's contention that he is a flight risk based solely on his actions on the day of his arrest is speculation, at best, and standing alone, cannot support a finding that there are no conditions which could mitigate the risk of non-appearance. In short, Mr. Naziry's panic-driven decision to hide is not sufficient in isolation to outweigh all other considerations about his history and characteristics that weigh in favor of release, including his over twenty years of residency in the United States without any criminal convictions, without any violation of court orders, and without any failures to appear. When this adverse factor is balanced against the numerous favorable factors, such as his lack of criminal history, history of prior employment, education, lack of substance abuse history, and lack of an incentive to flee, the government cannot meet its burden.

Additionally, while Magistrate Judge van Keulen found that Mr. Naziry's parents were not appropriate sureties in light of their conduct on the morning of the tactical operation, counsel for Mr. Naziry is reasonably informed his parents were traumatized by the raid on their home and remained in a traumatized state when questioned by law enforcement about their son's whereabouts. Undoubtedly, the traumatic life experience of Mr. Naziry's parents under the Taliban was also a factor in their unwillingness to tell officers about Mr. Naziry's whereabouts.

Finally, in view of the defense, the circumstances of Mr. Naziryi's arrest were excessive and entirely unnecessary. Mr. Naziry was interviewed by law enforcement two years before he moved to Florida. He provided officers with his phone number and understood he would be contacted at some later point. The government has offered no rationale for why it relied on a SWAT tactical team to arrest Mr. Naziry for a non-violent, white-collar offense, while defendants in cases involving loss amounts exceeding 1 million dollars are routinely issued target letters and summoned to appear. Over a dozen law enforcement officers were present to arrest Mr. Naziry. Those heavy-handed tactics were both unnecessary and ultimately counterproductive in this case. He has no criminal history. Nothing about his personal history justified that manner of his arrest.

The Ninth Circuit, by contrast, has found pretrial detention appropriate based on the risk of flight in far more serious circumstances. In *Santos-Flores*, for example, the Ninth Circuit found that the government presented sufficient evidence of risk of flight where the defendant had, among other things, "violat[ed] of the terms of his supervised release" in a prior case, had "multiple unlawful entries into the United States," and had a "prior failure to appear when required in state court." *Santos-Flores*, 794 F.3d at 1092. Additionally, the defendant in *Santos-Flores* "made no attempt to explain his prior charge of failure to appear and his other arrests, or to offer any countervailing circumstances," *id.*, while Mr. Naziry has provided a compelling explanation of his prior conduct.

Finally, the mere fact that Mr. Naziry is charged with an economic crime does not justify detention. Indeed, courts "rarely conclude that the economic harm presented rises to the level of danger of the community for which someone should be detained." *United States v. Madoff*, 586 F. Supp. 2d 240, 253–54 (S.D.N.Y. 2009) (releasing Madoff on conditions despite concerns that he posed an economic danger).

**IV. Defendants on Pretrial Release Have a High Degree of Success, While Pretrial Detention May Have Severe and Unintended Adverse Impacts**

The Court's determination of whether to release a defendant on pretrial release should take into account that "[d]efendants released in the federal system have a high degree of success, with 86 percent committing no new violations or failing to appear in court as required."[6] Additionally, granting a defendant pretrial release also helps avoid the serious adverse and unintended impacts of pretrial detention. Indeed, "[s]ocial science research shows that people held in jail pretrial are more likely to be convicted, to be sentenced to longer incarceration terms, or to commit new crimes post-trial compared to their released counterparts."[7]

Thus, the assumption that pretrial detention protects society is not borne out by the evidence. "The harmful effects of pretrial detention cannot be justified as permissible consequences of

---

[6] United States Courts, *Pretrial Release and Detention in the Federal Judiciary*, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/pretrial-services/pretrial-release-and-detention (visited Oct. 14, 2024).

[7] *Id.*

protecting the community, since research shows that pretrial detention—for any amount of time—is correlated with an increase in recidivism . . . . By contrast, pretrial release has been shown to improve case outcomes and mitigate the deleterious effects of facing federal criminal charges."[8] Finally, "[t]he relative cost of pretrial detention – about $92 per day – is also significantly higher than the cost of pretrial supervision – about $11 a day."[9]

Accordingly, the Court should follow the recommendation of Pretrial Services and order Mr. Naziry's release on conditions.

**CONCLUSION**

For the foregoing reasons, the Court should revoke the magistrate's detention order and set conditions of release.

Dated: October 17, 2024

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S
VARELL L. FULLER
Assistant Federal Public Defender

[8] Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 62 & n.102 (2022), https://freedomdenied.law.uchicago.edu/report.

[9] United States Courts, *Pretrial Release and Detention in the Federal Judiciary*, n.4.